IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

CENTER FOR BIOLOGICAL DIVERSITY, et al.,

                 Plaintiffs,

   v.

BUREAU OF LAND MANAGEMENT, et al.,

               Defendants, and

AMERICAN SAND ASSOCIATION, et al,

               Defendant-Intervenors.

_____/

No. C 03-02509 SI

**ORDER RE: CROSS MOTIONS FOR SUMMARY JUDGMENT**

On February 28, 2014, the Court held a hearing on the parties' cross-motions for summary judgment. For the reasons set forth below, the parties' cross-motions for summary judgment are GRANTED IN PART and DENIED IN PART.

**BACKGROUND**

This dispute marks the continuation of plaintiffs' challenge to the administration by the Bureau of Land Management ("BLM") of the Imperial Sand Dunes Recreation Area ("ISDRA" or "Dunes"), and the biological opinions related to the Dunes prepared by the U.S. Fish and Wildlife Service ("FWS") in accordance with the Endangered Species Act ("ESA"). The lengthy factual and procedural history of FWS and BLM's management actions related to the Dunes and plaintiffs' prior claims is set forth in this Court's March 14, 2006 Order granting in part and denying in part each side's motion for summary judgment. *See Ctr. for Biological Diversity ("CBD") v. BLM*, 422 F. Supp. 2d 1115 (N.D. Cal. 2006).[1]

_____

[1] The Court incorporates that history by reference.

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

In that decision, the Court held that FWS's 2005 biological opinion ("BiOp") for the 2003 ISDRA Recreation Area Management Plan (the "2003 RAMP") violated the Endangered Species Act in various respects with regard to two listed species, the Peirson's milk-vetch ("PMV") and the desert tortoise. *Id*. at 1121-22. The Court also held that FWS unlawfully excluded certain areas when it designated critical habitat for the PMV in 2004. *Id*. at 1122. Finally, the Court held that the BLM violated the National Environmental Policy Act by failing to consider interim off-highway vehicle ("OHV") closures[2] when it considered alternatives in the Environmental Impact Statement for the 2003 RAMP, and by failing to adequately examine the impact of the 2003 RAMP on endemic invertebrates. *Id*.

In response to the Court's 2006 opinion, in 2008 FWS issued a new critical habitat designation for the PMV. 73 Fed. Reg. 8748 (Feb. 14, 2008). Plaintiffs and other groups unsuccessfully challenged the new critical habitat designation. *See Maddalena v. FWS*, No. 3:08-cv-02292-H-AJB, 2010 WL 9915002 (S.D. Cal. Aug. 5, 2010). In June 2013, the BLM also issued a new Record of Decision adopting a new Recreation Area Management Plan (the "2013 RAMP") for the Dunes. Under the 2013 RAMP, the 26,000 acre North Algodones Dunes Wilderness remains closed to OHVs, as will an additional 9,261 acres of PMV critical habitat. The remainder of the Dunes – over 127,000 acres – will be opened to OHV use. Prior to issuing the Record of Decision, the BLM prepared a new Environmental Impact Statement (the "2013 EIS") analyzing the 2013 RAMP. Finally, after engaging in consultation pursuant to Section 7(a)(2) of the ESA, in November 2012, FWS issued a new BiOp concluding that implementing the 2013 RAMP is not likely to jeopardize the continued existence of the

---

[2] In March of 2000, the Center for Biological Diversity, the Sierra Club, and Public Employees for Environmental Responsibility filed a complaint alleging that the BLM was in violation of Section 7 of the ESA, 16 U.S.C. § 1536(a)(2), because it had failed to enter into formal consultation with the Service on the effects of the adoption of the CDCA Plan, as amended by the 1987 RAMP, on threatened and endangered species. *Center for Biological Diversity et al. v. BLM*, Case No. 00-0927 WHA-JCS (N.D. Cal.). Several groups of recreationists in the CDCA area were granted status as defendant-intervenors, and the parties ultimately entered into a settlement that established interim actions to be taken to provide temporary protection for endangered and threatened species pending completion of consultation between BLM and the Service on the CDCA Plan. *See* ROD AR Sec.3 at 15997. Pursuant to the stipulations, BLM temporarily closed five areas in the ISDRA, totaling approximately 49,000 acres, to OHV and other recreational use to protect the Peirson's milk-vetch, and temporarily closed to camping a 25,600 acre area to protect the desert tortoise. *See* BO AR Doc. # 128. These closures were to remain in place until BLM signed the decision document implementing the new RAMP for the ISDRA.

1    PMV or the desert tortoise.

2    On September 16, 2013, plaintiffs filed a third amended complaint challenging the 2013 RAMP,

3    the 2013 EIS and 2012 BiOp under the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531 *et seq.*,

4    the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321 *et seq.*, the Federal Land Policy

5    and Management Act of 1976 ("FLPMA"), 43 U.S.C. §§ 1701-1785, and the Administrative Procedure

6    Act ("APA"), 5 U.S.C. § 706 *et seq.*.  Plaintiffs allege that: (1) the 2012 BiOp is deficient because it

7    does not include an Incidental Take Statement for the PMV; (2) FWS has unreasonably delayed issuance

8    of a recovery plan for the PMV under Section 4(f) of the Endangered Species Act.; (3) the 2013 EIS

9    violates the National Environmental Policy Act ("NEPA") by failing to take a hard look at impacts on

10   wilderness areas; and (4) BLM violated NEPA, FLPMA and the Clean Air Act by failing to properly

11   evaluate the alleged impacts of the 2013 RAMP on air quality.[3]

12   Plaintiffs generally allege that the PMV is particularly threatened by OHV recreational use in

13   the Dunes, and that the 2013 management plan for the Dunes does not contain sufficient safeguards to

14   ensure against jeopardizing the continued existence of these species.  Defendants are the Bureau of Land

15   Management ("BLM"), which manages the ISDRA, and the U.S. Fish and Wildlife Service ("FWS" or

16   "Service"), which consults with the BLM and is required to evaluate BLM actions that affect the

17   Peirson's milk-vetch.   Defendant-intervenors are a number of organizations representing OHV

18   recreationists.

19

20                                            **LEGAL STANDARD**

21   "Neither the ESA nor NEPA supply a separate standard for our review, so we review claims

22   under these Acts under the standards of the APA." *San Luis & Delta-Mendota Water Authority v.*

23   *Jewell*, ___ F.3d ___, 2014 WL 975130, at *9 (9th Cir. Mar. 13, 2014).  Pursuant to Section 706 of the

24   _____

25        [3] The federal defendants and the intervenor defendants note that plaintiffs do not allege that the
     agencies have failed to correct any of the deficiencies identified by the Court in its 2006 summary
26   judgment order, and they assert that all of the new claims are raised for the first time at this stage of the
     litigation and could have been raised before.  While it is unclear whether the NEPA claims (such as the
27   air quality claim) could have been raised before, it is true that the 2005 BiOp did not contain an ITS for
     the PMV, and plaintiffs did not previously contend that FWS was required to prepare an ITS for the
28   PMV.

United States District Court
For the Northern District of California

Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq.*, the court "shall" set aside any agency decision that the Court finds is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The APA precludes a trial court reviewing an agency action from considering any evidence outside of the administrative record available to the agency at the time of the challenged decision. *See* 5 U.S.C. § 706(2)(E); *Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 743-44 (1985); *Havasupai Tribe v. Robertson*, 943 F.2d 32, 34 (9th Cir. 1991). "Because this is a record review case, we may direct that summary judgment be granted to either party based upon our *de novo* review of the administrative record." *Oregon Natural Desert Ass'n v. Bureau of Land Management*, 625 F.3d 1092, 1108 (9th Cir. 2010); *Riddell v. Unum Life Ins. Co. of Am.*, 457 F.3d 861, 864 (8th Cir. 2006) (explaining that judgment on the administrative record "is a form of summary judgment").

The Court must determine whether the agency decision "was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 416 (1971), *abrogated on other grounds, Califano v. Sanders*, 430 U.S. 99 (1977). The Supreme Court has explained that an agency action is arbitrary and capricious if "the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicles Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). "Although our inquiry must be thorough, the standard of review is highly deferential; the agency's decision is 'entitled to a presumption of regularity,' and we may not substitute our judgment for that of the agency." *San Luis & Delta-Mendota Water Authority*, ___ F.3d ___, 2014 WL 975130, at *9 (internal citation omitted). "Where the agency has relied on 'relevant evidence [such that] a reasonable mind might accept as adequate to support a conclusion,' its decision is supported by 'substantial evidence.'" *Id.* (internal citation omitted). "Even "[i]f the evidence is susceptible of more than one rational interpretation, [the court] must uphold [the agency's] findings." *Id.* (internal citation omitted).

**DISCUSSION**

**I.      Endangered Species Act - Incidental Take Statement**

For any federal action that may affect a threatened or endangered species (or its habitat), Congress has required by statute that the agency contemplating the action (here the BLM) must consult pursuant to Section 7(a) of the ESA with the consulting agency (here the FWS) to "insure" that the federal action "is not likely to [1] jeopardize the continued existence of any endangered species or threatened species or [2] result in the destruction or adverse modification" of the designated critical habitat of such species. 16 U.S.C. § 1536(2). After the agencies engage in the consultation process, the consulting agency issues a BiOp.

Under Section 7(b)(4) of the ESA, "[t]he FWS must issue an Incidental Take Statement if the BiOp concludes no jeopardy to listed species or adverse modification of critical habitat will result from the proposed action, but the action is likely to result in incidental takings." *Oregon Natural Resources Council v. Allen*, 476 F.3d 1031, 1036 (9th Cir. 2007) (citing 16 U.S.C. § 1536(b)(4); 50 C.F.R. § 402.14(i); and *Ariz. Cattle Growers' Ass'n*, 273 F.3d 1229, 1242 (9th Cir. 2001)). "Both the BiOp and the Incidental Take Statement must be formulated by the FWS during the formal consultation process; indeed, the regulations specifically require the FWS to provide the Incidental Take Statement 'with the biological opinion.'" *Id.* (quoting 50 C.F.R. § 402.14(g), (i)(1)). Incidental take in compliance with the terms and conditions in the ITS "shall not be considered to be a prohibited taking of the species concerned." 16 U.S.C. § 1536(o)(2). Section 7 consultation must be reinitiated when the amount or extent of taking specified in the ITS is exceeded, as well as when new information reveals impacts of the action on listed species that were not previously considered or when the agency action is changed in a way that causes impacts on listed species that were not previously considered. *See* 50 C.F.R. § 402.16(a)-(c).

Section 7(b)(4) provides,

(b) Opinion of Secretary

. . .

5

United States District Court

For the Northern District of California

(4) If after consultation under subsection (a)(2)[4] of this section, the Secretary concludes that–

(A) the agency action will not violate such subsection, or offers reasonable and prudent alternatives which the Secretary believes would not violate such subsection;

(B) the taking of an endangered species or a threatened species incidental to the agency action will not violate such subsection; and

(C) if an endangered species or threatened species of a marine mammal is involved, the taking is authorized pursuant to section 1371(a)(5) of this title;

the Secretary shall provide the Federal agency and the applicant concerned, if any, with a written statement that–

(i) specifies the impact of such incidental taking on the species,

(ii) specifies those reasonable and prudent measures that the Secretary considers necessary or appropriate to minimize such impact,

(iii) in the case of marine mammals, specifies those measures that are necessary to comply with section 1371(a)(5) of this title with regard to such taking, and

(iv) sets forth the terms and conditions (including, but not limited to, reporting requirements) that must be complied with by the Federal agency or applicant (if any), or both, to implement the measures specified under clauses (ii) and (iii).

16 U.S.C. § 1536(b)(4).

The 2012 BiOp does not contain an ITS for the PMV.  Plaintiffs contend that FWS was required to prepare an ITS for the PMV, while defendants contend that an ITS is only required for listed fish and wildlife, not for listed plants.  The parties' dispute involves the interplay of Sections 7 and 9 of the ESA.  Section 9 of the ESA and its implementing regulations prohibit the "take" of "any endangered species of fish or wildlife," and provides separate protections for endangered plants.  *See* 16 U.S.C. § 1538(a)(1); 50 C.F.R. § 17.31.  Section 9, titled "Prohibited Acts," states,

§ 1538. Prohibited acts

---

[4]  Section 7(a)(2) provides, "Each Federal agency shall, in consultation with and with the assistance of the Secretary, insure that any action authorized, funded, or carried out by such agency (hereinafter in this section referred to as an "agency action") is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species which is determined by the Secretary, after consultation as appropriate with affected States, to be critical, unless such agency has been granted an exemption for such action by the Committee pursuant to subsection (h) of this section. In fulfilling the requirements of this paragraph each agency shall use the best scientific and commercial data available."  16 U.S.C. § 1536(a)(2).

6

(a) Generally

(1) Except as provided in sections 1535(g)(2) and 1539 of this title, *with respect to any endangered species of fish or wildlife* listed pursuant to section 1533 of this title it is unlawful for any person subject to the jurisdiction of the United States to--

    (A) import any such species into, or export any such species from the United States;

    (B) take any such species within the United States or the territorial sea of the United States;

    (C) take any such species upon the high seas;

    (D) possess, sell, deliver, carry, transport, or ship, by any means whatsoever, any such species taken in violation of subparagraphs (B) and (C);

    (E) deliver, receive, carry, transport, or ship in interstate or foreign commerce, by any means whatsoever and in the course of a commercial activity, any such species;

    (F) sell or offer for sale in interstate or foreign commerce any such species; or

    (G) violate any regulation pertaining to such species or to any threatened species of fish or wildlife listed pursuant to section 1533 of this title and promulgated by the Secretary pursuant to authority provided by this chapter.

(2) Except as provided in sections 1535(g)(2) and 1539 of this title, *with respect to any endangered species of plants* listed pursuant to section 1533 of this title, it is unlawful for any person subject to the jurisdiction of the United States to--

    (A) import any such species into, or export any such species from, the United States;

    (B) remove and reduce to possession any such species from areas under Federal jurisdiction; maliciously damage or destroy any such species on any such area; or remove, cut, dig up, or damage or destroy any such species on any other area in knowing violation of any law or regulation of any State or in the course of any violation of a State criminal trespass law;

    (C) deliver, receive, carry, transport, or ship in interstate or foreign commerce, by any means whatsoever and in the course of a commercial activity, any such species;

    (D) sell or offer for sale in interstate or foreign commerce any such species; or

    (E) violate any regulation pertaining to such species or to any threatened species of plants listed pursuant to section 1533 of this title and promulgated by the Secretary pursuant to authority provided by this chapter.

16 U.S.C. § 1538(a)(1)-(2) (emphasis added). Thus, Section 9(a)(1) prohibits the "take" of endangered fish or wildlife, while Section 9(a)(2) does not use the term "take," but contains a range of other protections for endangered plants. The ESA defines "take" as "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." *Id*. § 1532(19).

7

United States District Court
For the Northern District of California

Pursuant to Section 4(d) of the ESA, FWS may by regulation extend the Section 9(a)(1) "take" prohibition to threatened fish or wildlife, and may extend the protections of Section 9(a)(2) to threatened plants. *Id.* § 1533(d).[5]

Plaintiffs argue that an ITS is required for plants because Section 7(b)(4) ties the ITS requirement to the conclusion of a consultation under Section 7(a)(2), and Section 7(a)(2) provides that consultation is required for federal actions affecting "any endangered species or threatened species," regardless of whether the species is plant or wildlife. 16 U.S.C. § 1536(a)(2). Plaintiffs emphasize the fact that Section 7(b)(4) – the provision requiring the preparation of an ITS – also refers to "any endangered species or threatened species." Plaintiffs argue that "if an action triggers consultation on a listed plant under section 7(a)(2), nothing in the ESA's language suggests that the resulting BiOp need not contain an ITS." Docket No. 236 at 7-8. Plaintiffs argue that it is irrelevant that Section 9's prohibition of "take" only applies to wildlife because the plain language of Section 7 requires an ITS for "any endangered species or threatened species."

Plaintiffs also rely on *Center for Biological Diversity v. Salazar*, 695 F.3d 893 (9th Cir. 2012). In that case, the FWS prepared an ITS for the threatened polar bear, and the plaintiffs challenged the ITS as inadequate because it did not specify a numerical limit for permissible take. The FWS argued, *inter alia*, that it was not even required to prepare an ITS because when the FWS listed the polar bear as threatened, the FWS also issued a Section 4(d) rule that applied most of the Section 9 prohibitions to the polar bear, but not the prohibition on take. The Section 4(d) rule stated that "[n]othing in this special rule affects the issuance or contents of the biological opinions for polar bears or the issuance of an incidental take statement, although incidental take resulting from activities that occur outside of the current range of the polar bear is not subject to the taking prohibition of the ESA." *Id.* at 911 (quoting

---

[5] Section 4(d) of the ESA, titled "Protective Regulations" provides, "Whenever any species is listed as a threatened species pursuant to subsection (c) of this section, the Secretary shall issue such regulations as he deems necessary and advisable to provide for the conservation of such species. The Secretary may by regulation prohibit with respect to any threatened species any act prohibited under section 1538(a)(1) of this title, in the case of fish or wildlife, or section 1538(a)(2) of this title, in the case of plants, with respect to endangered species; except that with respect to the taking of resident species of fish or wildlife, such regulations shall apply in any State which has entered into a cooperative agreement pursuant to section 1535(c) of this title only to the extent that such regulations have also been adopted by such State." 16 U.S.C. § 1533(d).

United States District Court
For the Northern District of California

73 Fed. Reg. 76,249, 76,252 (Dec. 16, 2008)).  The Ninth Circuit rejected the FWS's argument that an ITS was not required, holding that "exemption from Section 9 take liability is irrelevant to the Service's Section 7 obligations to prepare a BiOp and ITS. . . . The ESA requires an ITS for 'the taking of an endangered species or a threatened species incidental to the agency action,' 16 U.S.C. § 1536(b)(4)(B) (emphasis added), not the prohibited taking."  *Id*. at 910.  The Ninth Circuit noted that "[t]he Association's argument fails to recognize that exemption from Section 9 take liability is not the sole purpose of the ITS.  If the amount or extent of taking specified in the ITS is exceeded, reinitiation of formal consultation is required."  *Id*. at 911 (internal quotations and citation omitted).  Plaintiffs rely on this language to argue that FWS has an obligation to prepare an ITS for the PMV under Section 7 regardless of that fact that Section 9 take liability does not apply to listed plants.

Defendants assert – and plaintiffs do not deny – that no court has ever held that Section 7 requires an ITS for listed plants, and that the one court that has addressed this question held that an ITS is not required for listed plants.  *See California Native Plant Society v. Norton*, No. 01CV1742 DMS (JMA), 2004 WL 1118537, at *8 (S.D. Cal. Feb. 10, 2004).[6]  Defendants argue that an ITS is not required under Section 7 of the ESA "because the Incidental Take Statement's primary function is to authorize the taking of animals incidental to the execution of a particular proposed action."  *Oregon Natural Resources Council*, 476 F.3d at 1036.  Defendants argue that because Section 9 only prohibits the take of listed fish or wildlife, there is no requirement under Section 7 to prepare an ITS for a listed plant.  Defendants contend that plaintiffs' argument is also foreclosed by the Ninth Circuit's holding that "the definition of 'taking' in Sections 7 and 9 of the ESA are identical in meaning and application."  *Arizona Cattle Growers' Ass'n v. U.S. Fish and Wildlife*, 273 F.3d 1229, 1237 (9th Cir. 2001). In that case, the Ninth Circuit held,

> The structure of the ESA and the legislative history clearly show Congress's intent to enact one standard for 'taking' within both Section 7(b)(4), governing the creation of Incidental Take Statements, and Section 9, imposing civil and criminal penalties for violation of the ESA.  In 1982, Congress amended the ESA to include Section 7(b)(4) to resolve the conflict between Sections 7 and 9.  *See* H.R.Rep. No. 97–567, at 15 (1982).  As noted in the legislative reports, the

---

[6]  Plaintiffs argue that *California Native Plant Society* is unpersuasive because it predated the Ninth Circuit's decision in *Salazar*.  The Court discusses *Salazar* infra.

United States District Court

For the Northern District of California

1
2
3
4

> purpose of Section 7(b)(4) and the amendment to Section 7(o) is to resolve the situation in which a Federal agency or a permit or license applicant has been advised that the proposed action will not violate Section 7(a)(2) of the Act but the proposed action will result in the taking of some species incidental to that action—a clear violation of Section 9 of the Act which prohibits any taking of a species.

5

> H.R.Rep. No. 97–567, at 26 (1982), reprinted in 1982 U.S.C.C.A.N. 2807, 2826. Absent an actual or prospective taking under Section 9, there is no "situation" that requires a Section 7 safe harbor provision.

6

*Id*. at 1239-40.

7
8

Defendants also rely on *Northern California River Watch v. Wilcox*, 547 F. Supp. 2d 1071 (N.D. Cal. 2008).  In that case, Judge Breyer noted that "[S]ection 10 – allowing a private party to apply for

9
10

an incidental take permit – applies only to fish and wildlife – there is no section 10 incidental take permit provision for endangered plants." *Id*. at 1075.[7]  Defendants argue that Section 7's ITS provisions

11
12

cannot be interpreted differently than those of Section 10 because the take provisions of Sections 7 and 10 were enacted at the same time to address the same issue: the situation where an action is non-

13
14

jeopardizing but "remain[s] subject to the Section 9 prohibition against taking individual specimens of endangered or threatened species of fish or wildlife." H.R. Conf. Rep. 97-835 (1982), *reprinted in* 1982

15
16

U.S.C.C.A.N. 2860, 2868.  Defendants assert that the ESA does not prohibit "incidental" harm to listed plants that could require incidental take authorization under Sections 7 or 10, and instead that the limited

17
18

prohibitions for listed plants in Section 9(a)(2) require malicious or deliberate conduct.

19
20

Defendants also note that the FWS has always defined "incidental take" as "take of *listed fish or wildlife species* that results from, but is not the purpose of, carrying out an otherwise lawful activity."

21
22

*Endangered Species Consultation Handbook: Procedures for Conducting Consultation and Conference Activities Under Section 7 of the Endangered Species Act*, at xv (1998) ("*ESA Handbook*") (emphasis

23
24

added), available at http://www.fws.gov/endangered/esa-library/.  Defendants contend that the agency's interpretation is rational, consistent with the statute, and entitled to deference under *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc*., 467 U.S. 837, 842 (1984).

25
26

The *Chevron* inquiry requires a two-step analysis.  At step one, the Court asks "whether

27
28

---

[7]  In that case, the question was whether "areas under Federal jurisdiction" in ESA Section 9(a)(2)(B) encompassed wetlands adjacent to navigable waterways and were therefore subject to the requirements of the Clean Water Act.

United States District Court
For the Northern District of California

Congress has directly spoken to the precise question at issue." *Id.* "If the intent of Congress is clear, that is the end of the matter; [and we] . . . must give effect to the unambiguously expressed intent of Congress." *Id.* at 842-43. "[I]nquiry into congressional intent encompasses both statutory language and legislative history." *Edwards v. McMahon*, 834 F.2d 796, 799 (9th Cir. 1987) (citation omitted). "If, however, the statute is silent or ambiguous, prior to step two, we must decide how much weight to accord an agency's interpretation." *McMaster v. U.S.*, 731 F.3d 881, 889 (9th Cir. 2013) (internal quotation marks and citations omitted). "If we determine that *Chevron* deference applies, then we move to step two, where we will defer to the agency's interpretation if it is 'based on a permissible construction of the statute.'" *Id.* (quoting *Chevron*, 467 U.S. at 843).

The Court concludes under the first step of the *Chevron* inquiry that the statutory language and the legislative history demonstrate that the Section 7 requirement to prepare an ITS does not apply to listed plants. Section 9(a)(1) prohibits the take of endangered "fish and wildlife," and not of plants, while Section 9(a)(2) provides a variety of protections to endangered plants and does not protect against incidental take. As defendants note, the Section 9(a)(2) prohibitions for plants require deliberate or malicious conduct, whereas "incidental" take can occur without such intent. An ITS "must specify whether any 'incidental taking' of protected species will occur, specifically 'any taking otherwise prohibited, if such taking is incidental to, and not the purpose of, the carrying out of an otherwise lawful activity.'" *Ariz. Cattle Growers' Ass'n*, 273 F.3d at 1239 (quoting 16 U.S.C. § 1536(b)(4) and 50 C.F.R. § 17.3) (emphasis added).[8] The only taking "otherwise prohibited" is take of listed "fish or wildlife." 16 U.S.C. § 1538(a)(1). Thus, while an ITS serves as a regulatory trigger for reinitiating Section 7 consultation, 50 C.F.R. § 402.16, *Ariz. Cattle Growers*, 273 F.3d at 1249, an ITS is only required in the first instance when the proposed action is likely to take listed fish or wildlife. "A plain reading of the statute reveals that the Act prohibits the 'take' of fish or wildlife, but not the 'take' of

---

[8] This Court recognizes that there is arguably tension between *Salazar* and *Arizona Cattle Growers*, and that plaintiffs' argument finds support in some of the broad language in *Salazar*. However, in *Salazar* the Ninth Circuit was not addressing the question of whether an ITS is required for listed plants, but rather whether FWS was required to prepare an ITS for the polar bear where a Section 4(d) regulation provided that "[n]othing in this special rule affects the issuance or contents of the biological opinions for polar bears or the issuance of an [ITS]." *Salazar*, 695 F.3d at 911. The Court finds that *Salazar* is distinguishable on these grounds and that *Salazar* does not compel the result plaintiffs seek.

plant species. . . . In the absence of a prohibition on the 'take' of plant species, . . . such take cannot occur, and no incidental take statement is needed." *California Native Plant Society*, 2004 WL 1118537, at *8 (internal quotation marks and citations omitted).

Plaintiffs emphasize the fact that the statutory definition of "take" does not distinguish between wildlife and plants. *See* 16 U.S.C. § 1532(19). However, as defendants note, the "take" definition was part of the ESA when it was originally enacted in 1973, prior to the 1982 amendments adding the incidental take provisions of Sections 7 and 10. *See* P.L. 93-205 § 3(14), 87 Stat. 884 (Dec. 28, 1973). Thus, "take" was defined in the original enactment of the ESA to explain the meaning of "take" in Section 9(a), which only applies to fish and wildlife.

Interpreting Section 7 as requiring an ITS for fish and wildlife but not plants is also consistent with the take provision in Section 10, which only applies to listed animals. It is a "fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *Davis v. Mich. Dep't of Treasury*, 489 U.S. 803, 809 (1989). "A court must therefore interpret the statute as a symmetrical and coherent regulatory scheme and fit, if possible, all parts into an harmonious whole." *Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000) (citations omitted).

In addition, the legislative history of the 1982 amendments makes clear that Section 7's incidental take provisions do not apply to listed plants because plants are not subject to take under Section 9:

> Under the existing provisions of the Act, Federal agencies that receive favorable biological opinions which conclude that the agency action would not violate section 7(a)(2) remain subject to the section 9 prohibition against take of individual specimens of endangered species of fish or wildlife….
>
> [The bill] would address this problem by amending section 7(b) of the Act to require the Secretary, in cases where he has concluded that the agency action would not violate section 7(a)(2), to provide a written statement specifying (1) the extent of take incidental to the agency action that would not violate section 7(a)(2); and (2) those reasonable and prudent measures that must be followed to minimize such takings. If a Federal or private action that is in compliance with the measures specified to minimize takings results in the taking of specimens of a species that was the subject of the biological opinion, such action will not be considered a "taking" for purposes of section 9 of the Act. Actions that are not in compliance with the specified measures, however, remain subject to the prohibition against takings that is contained in section 9.

1    S. Rep. No. 97-418 (1982) (Docket No. 232-1 at 20-21).

2        Accordingly, the Court concludes that FWS was not required to prepare an ITS for the PMV,

3    and GRANTS summary judgment in favor of defendants on this issue.

4

5    **II.    Endangered Species Act – Recovery Plan**

6        Plaintiffs bring a claim under the Endangered Species Act challenging FWS's failure to prepare

7    a final recovery plan for the PMV.  Section 4 of the ESA provides that "[t]he Secretary shall develop

8    and implement plans (hereinafter in this subsection referred to as 'recovery plans') for the conservation

9    and survival of endangered species and threatened species listed pursuant to this section, unless he finds

10   that such a plan will not promote the conservation of the species." 16 U.S.C. § 1533(f).  "The recovery

11   plan, once prepared, provides [a] 'basic road map to recovery, i.e., the process that stops or reverses the

12   decline of a species and neutralizes threats to its existence.'"   *Ctr. for Biological Diversity v.*

13   *Kempthorne*, 607 F. Supp. 2d 1078, 1088 (D. Ariz. 2009) (quoting *Defenders of Wildlife v. Babbitt*, 130

14   F. Supp. 2d 121, 131 (D.D.C. 2001)).  "A recovery plan must contain three essential elements: (1) a

15   description of site specific management actions that may be necessary to recover the species; (2)

16   objective and measurable criteria which, when met, would result in a determination that the species be

17   removed from the list; and (3) estimates of the time and cost required to carry out those measures needed

18   to recover the species and to achieve intermediate steps towards that goal."  *Ctr. for Biological*

19   *Diversity*, 607 F. Supp. 2d at 1087-88 (citing 16 U.S.C. § 1533(f)(1)(B)(i)-(iii)).    While the ESA

20   imposes specific deadlines for certain actions, *see, e.g.*, 16 U.S.C. § 1533(b)(3), (5)-(6), it prescribes no

21   deadline for completing a recovery plan, *id*. § 1533(f).  The FWS listed the Peirson's milk-vetch in

22   1998, but has yet to issue a recovery plan. 63 Fed. Reg. 53,596 (Oct. 6, 1998).  Plaintiffs contend that

23   the agency's delay in issuing a recovery plan is unreasonable and requires judicial intervention.

24       As an initial matter, the federal defendants and defendant-intervenors argue that FWS does not

25   have a duty to issue a recovery plan and thus that the Court cannot grant the relief that plaintiffs seek.

26   Defendants argue that FWS does not have a duty to issue a recovery plan because Section 1533(f) states

27   that the Secretary "shall develop and implement [recovery plans] . . . , *unless* he finds that such a plan

28   will not promote the conservation of the species."  16 U.S.C. § 1533(f) (emphasis added).  Defendants

argue that this language vests FWS with discretion to either prepare a recovery plan or determine that a recovery plan will not promote conservation of the species, and thus that this Court cannot require FWS to prepare a recovery plan.[9]

As support, defendants cite cases interpreting the APA and holding that courts may not review an agency's failure to make a completely discretionary decision. *See S. Utah Wilderness Alliance v. Norton*, 542 U.S. 55, 64 (2004) (claim under APA "can proceed only where a plaintiff asserts that an agency failed to take a discrete agency action that it is required to take."); *Drakes Bay Oyster Co. v. Salazar*, 921 F. Supp. 2d 972, 988 (N.D. Cal. 2013) (holding there was no judicial review over agency's discretionary decision to deny permit), *aff'd* ___ F.3d ___, 2014 WL 114699 (9th Cir. Jan. 14, 2014). However, plaintiffs bring their claim directly under the ESA, not the APA. The ESA authorizes citizen suits to challenge "a failure of [FWS] to perform any act or duty under section 4 [of the ESA] which is not discretionary." 16 U.S.C. § 1540(g)(1)(C); *Wash. Toxics Coalition v. EPA*, 413 F.3d 1024, 1034 (9th Cir. 2005) ("suits to compel agencies to comply with the substantive provisions of the ESA arise under the ESA citizen suit provision, and not the APA").

Defendants do not cite any cases interpreting Section 1533(f) as conferring discretionary authority on the FWS to issue a recovery plan in the absence of a determination that a recovery plan will not promote the conservation of the species.[10] In *Bennett v. Spear*, 520 U.S. 154 (1997), the Supreme

---

[9] As discussed *infra*, FWS has prepared a draft recovery plan and anticipates that it can complete the recovery plan by July 31, 2019.

[10] Intervenor defendants cite *National Wildlife Federation v. National Park Service*, 669 F. Supp. 384 (D. Wyo. 1987), and *Conservation Northwest v. Kempthorne*, No. C04-1331-JCC, 2007 WL 1847143 (W.D. Wash. 2007). In both cases, the FWS had prepared recovery plans for the grizzly bear, and the plaintiffs brought suit challenging the agency's delay in implementing those plans. In *National Wildlife Foundation*, the court held that "the Secretary is required to develop a recovery plan only insofar as he reasonably believes that it would promote conservation," and concluded that "[t]his Court will not attempt to second guess the Secretary's motives for not following the recovery plan." *National Wildlife Federation*, 669 F. Supp. at 388-89. In *Conservation Northwest*, the court found that the "discretionary nature of the time line of implementation of recovery plans" divested the court of jurisdiction to review the claim of unreasonable delay. *Conservation Northwest*, 2007 WL 1847143, at *4.

The Court finds that these cases are factually distinguishable in that they involve the implementation of recovery plans, and not the failure to prepare a recovery plan. To the extent that either case holds more broadly that the Secretary has the discretion not to prepare a recovery plan without also finding that a recovery plan will not promote the conservation of a species, this Court disagrees with that interpretation of Section 1533(f).

United States District Court
For the Northern District of California

Court analyzed a similar provision in the ESA directing that "[t]he Secretary shall designate critical habitat . . . . [and] [t]he Secretary may exclude any area from critical habitat if he determines that the benefits of such exclusion outweigh the benefits of specifying such area as part of the critical habitat . . . ." 16 U.S.C. § 1533(b)(2).  The Court held that "the terms of § 1533(b)(2) are plainly those of obligation rather than discretion." *Bennett*, 520 U.S. at 172.  The Court further explained,

> It is true that this is followed by the statement that, except where extinction of the species is at issue, "[t]he Secretary *may* exclude any area from critical habitat if he determines that the benefits of such exclusion outweigh the benefits of specifying such area as part of the critical habitat."  However, the fact that the Secretary's ultimate decision is reviewable only for abuse of discretion does not alter the categorical requirement that, in arriving at his decision, he "tak[e] into consideration the economic impact, and any other relevant impact," and use "the best scientific data available."  It is rudimentary administrative law that discretion as to the substance of the ultimate decision does not confer discretion to ignore the required procedures of decisionmaking.  Since it is the omission of these required procedures that petitioners complain of, their § 1533 claim is reviewable under § 1540(g)(1)(C).

*Id.* (internal citations omitted) (emphasis in original).

As with the provision at issue in *Bennett*, Section 1533(f) states that the Secretary "shall" develop a recovery plan, and the Court finds that the terms of this section are "those of obligation rather than discretion."  *Id.*  The Court finds that Section 1533(f) requires FWS to either issue a recovery plan or determine that a recovery plan will not promote the conservation of the species, and does not permit the FWS the discretion to do neither.  *See Brower v. Evans*, 257 F.3d 1058, 1067 n.10 (9th Cir. 2001) ("'Shall' means shall."); *see also United States v. Monsanto*, 491 U.S. 600, 607 (1989) (by using "shall" "Congress could not have chosen stronger words to express its intent that forfeiture be mandatory.").  Defendants do not assert that FWS has determined that a recovery plan will not promote conservation of the PMV, and to the contrary, the evidence in the record shows that FWS has not made such a determination.  Thus, the Court agrees with plaintiffs that, absent an express determination that a recovery plan will not promote conservation, FWS is required to issue a recovery plan for the PMV.

Because the ESA "contains no internal standard of review," the Ninth Circuit has held that the standards provided under Section 706 of the APA govern in ESA cases.  *W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 496 (9th Cir. 2011).  Section 706 of the APA requires that a court "shall . . . compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1); *see also*

*id.* § 555(b) (agency must "conclude a matter presented to it . . . within a reasonable time").  Pursuant to Section 706, "even though agency action may be subject to no explicit time limit, a court may compel an agency to act within a reasonable time." *Houseton v. Nimmo*, 670 F.2d 1375, 1377 (9th Cir. 1982); *Forest Guardians v. Babbitt*, 174 F.3d 1178, 1186 (10th Cir. 1998) (in ESA case, finding "if an agency has no concrete [statutory] deadline . . . and instead is governed only by general timing provisions – such as the APA's general admonition [to] conclude matters . . . 'within a reasonable time,'" a court may compel delayed action).

To determine whether delay is "unreasonable" under APA Section 706, courts apply the factors set forth by the Court of Appeals for the District of Columbia Circuit in *Telecommunications Research & Action Center v. FCC*, 750 F.2d 70 (D.C. Cir. 1984) ("*T.R.A.C.*").  *See Independence Mining Co. v. Babbitt*, 105 F.3d 502, 507 (9th Cir. 1997) (adopting *T.R.A.C.* factors); *Biodiversity Legal Found. v. Badgley*, 309 F.3d 1166, 1177 n.11 (9th Cir.  2002) (noting *T.R.A.C.* factors apply "in the absence of a firm deadline").  Under these factors, the Court considers the following guidelines to determine whether an agency's delay is unreasonable:

> 1) a "rule of reason" governs the time agencies take to make decisions; 2) delays where human health and welfare are at stake are less tolerable than delays in the economic sphere; 3) consideration should be given to the effect of ordering agency action on agency activities of a competing or higher priority; 4) the court should consider the nature of the interests prejudiced by delay; and 5) the agency need not act improperly to hold that agency action has been unreasonably delayed.

*Towns of Wellesley, Concord, and Norwood, Mass. v. FERC*, 829 F.2d 275, 277 (1st Cir. 1987) (citing *T.R.A.C.*, 750 F.2d at 80).

Plaintiffs contend that FWS's delay – which they measure from the date that the PMV was listed – has been unreasonable, and they seek an order requiring FWS to issue a recovery plan within two years.  Plaintiffs cite a number of cases in which courts found that a delay of several years was unreasonable and warranted court intervention.  *See, e.g.*, *Defenders of Wildlife v. Browner*, 909 F. Supp. 1342 (D. Ariz. 1995); *Hells Canyon Preserv. Council v. Richmond*, 841 F. Supp. 1039 (D. Or. 1995).

FWS argues that it has not unreasonably delayed in preparing a recovery plan for the PMV, and that no judicial intervention is required.  FWS also asserts that the cases cited by plaintiffs are

United States District Court
For the Northern District of California

inapplicable because here FWS has shown that the additional time it requires to prepare a recovery plan is reasonable in light of the agency's increasingly limited resources and competing priorities.   In the alternative, FWS asserts that if the Court finds that judicial intervention is necessary, the Court should adopt the July 31, 2019 date identified by FWS as the date by which a PMV recovery plan could be completed.

FWS has submitted the Declaration of Ren Lohoefener, Regional Director for FWS's Pacific Southwest Region (Region 8).[11]   Docket No. 223.  Mr. Lohoefener states that Region 8 has the lead responsibility for more than 290 listed species, and that funding for recovery plans and other statutory obligations related to species recovery is limited.  *Id.* ¶¶ 2-5. Mr. Lohoefener states that because funding is limited, Region 8 must prioritize recovery actions.  *Id.* ¶¶ 4-5.  Using a ranking system finalized in 1983, FWS has given the PMV a recovery priority number of 9 on a scale of 1-18 (with one being the highest priority and 18 the lowest), "indicating a moderate degree of threat and high recovery potential." *Id.* ¶¶ 6-7. Mr. Lohoefener states that Region 8 has completed recovery plans for 202 listed species for which it is responsible and drafted plans for an additional 17 species.  *Id.* ¶ 3.  Region 8's Carlsbad Fish and Wildlife Field Office ("CFWO"), which has responsibility for the PMV, issued a contract in 2003 for the preparation of a PMV recovery plan, and received a draft plan in 2007.  *Id.* ¶ 8.  Mr. Lohoefener states that "Region 8's limited staff has been unable to revise or finalize the draft due to higher priority recovery work."  *Id.*

Mr. Lohoefener provides as an example of higher priority recovery work a settlement that FWS entered into in 2005 in *Cal. State Grange v. Norton*, No. 2:05-cv-00560 (E.D. Cal. filed March 22, 2005).  That settlement required FWS to complete statutorily-required five-year status reviews on 194

---

[11] Plaintiffs did not object to the submission of Mr. Lohoefener's declaration, and stated in their opposition papers that they reserved the right to seek discovery or further testimony from Mr. Lohoefener prior to the summary judgment hearing. *See* Docket No. 236 at 3:20-23.  Plaintiffs did not supplement the record with regard to Mr. Lohoefener's declaration.  Although judicial review of an agency decision generally focuses on the administrative record in existence at the time of the decision, "[r]eview may, however, be expanded beyond the record . . . (1) if necessary to determine whether the agency has considered all relevant factors and has explained its decision, (2) when the agency has relied on documents not in the record, or (3) when supplementing the record is necessary to explain technical terms or complex subject matter." *Southwest Center for Biological Diversity v. U.S. Forest Service*, 100 F.3d 1443, 1450 (9th Cir. 1996) (internal quotation marks and citations omitted).  The Court finds that Mr. Lohoefener's declaration is necessary to determine whether the agency has considered all relevant factors and explained its decision not to prepare a recovery plan thus far.

listed species, with Region 8 serving as the lead for all but two. *Id.* ¶ 9. Mr. Lohoefener states that "[d]uring the eight-year period covered by the agreement, much of Region 8's recovery efforts and funding were devoted to completing these status reviews, including one for the PMV (completed September 30, 2008)." *Id.* In September 2013, FWS completed the last status reviews required under the settlement agreement. *Id.*

Mr. Lohoefener states that as a result of the 2005 settlement and other priorities, Region 8 has only recently been able to increase its efforts on developing recovery plans. *Id.* ¶ 14. In May 2013, Region 8 revised its Recovery Plan Work Activity Guidance ("WAG"), identifying 29 high-priority species for recovery plan development during fiscal years 2013-2017. *Id.* ¶¶ 14-18 & Exs. A-B. Mr. Lohoefener states CFWO did not plan to develop a recovery plan for the PMV during this time period based on CFWO's determination that "recovery might be more effectively realized through implementation of BLM's ISDRA RAMP." *Id.* ¶ 16. Mr. Lohoefener states,

> Of the 29 species identified for recovery plan development in the FY13-FY17 WAG, only three species in the WAG have RPNs of 9 [the same as the PMV]. All other species in the FY13-FY17 WAG have "higher" RPNs (RPNs between 1 and 8) and are therefore a higher priority for plan development than Peirson's milk-vetch. Each of the three species in the current WAG with recovery priorities equal to that of Peirson's milk-vetch have been included in the WAG due to a special circumstance. *Cordylanthus mollis* subsp. *mollis* (Soft bird's beak) (RPN = 9C) is part of the ecosystem-based Tidal Marsh Recovery Plan which also includes higher-priority species. Santa Catalina Island fox (*Urocyon littoralis catalinae*) (RPN = 9) is part of the multi-species Island Fox Recovery Plan which also includes higher-priority species. Recovery plan development for a third species in the WAG with an RPN of 9C, the California tiger salamander (*Ambystoma californiense*), is moving forward only because it is part of a separate court-approved settlement agreement which was entered into prior to the finalization of the FY13-FY17 WAG.

*Id.* ¶ 19.

Mr. Lohoefener also states that much of Region 8's recovery effort and funding have been devoted to important recovery work for the PMV, including responding to two delisting petitions, conducting two separate status reviews, conducting two field studies which resulted in a peer-reviewed publication and a published note, and developing a seed bank sampling protocol with BLM. *Id.* ¶¶ 10-11 (citing FW5927-6016). In addition, in 2009 FWS issued a "Spotlight Species Action Plan" for the PMV specifying actions to advance species recovery, *id.* ¶ 12 (citing FW527-32), and in the fall of 2012, CFWO staff worked with BLM to develop a monitoring protocol to assess the stability of PMV

18

populations in the ISDRA.  *Id.* (citing ISD40884-89).  Field sampling to evaluate the protocol was conducted in February 2013.  *Id.*

Mr. Lohoefener also states that, in light of this litigation, FWS anticipates it could "submit to the Federal Register a notice of availability of a final recovery plan by July 31, 2019, subject to workload constraints and available appropriations.  The July 31, 2019 date is a reasonable projection based on our current workload that would result in a final recovery plan for Peirson's milk-vetch without compromising our ability to develop recovery plans for the higher priority species in our current 5-year [Regional Recovery Plan Work Activity Guidance (WAG)]."  *Id.* ¶ 21.

Applying the *T.R.A.C.* factors, the Court concludes that it is appropriate to adopt the July 31, 2019 date identified by FWS as the deadline to complete a PMV recovery plan, unless FWS "finds that such a plan will not promote the conservation of the [PMV]." 16 U.S.C. § 1533(f)(1).  The Court is very concerned about the FWS's failure to issue a recovery plan for the PMV.  However, the delay does not involve human health and welfare, and in recent years the FWS has devoted resources to recovery work for the PMV, such as responding to two delisting petitions, preparing two status reviews, and preparing the seed bank sampling protocol.  The Court also notes that the 2013 RAMP closes to OHV use all PMV critical habitat, which encompasses 85% of the known overall PMV population and areas "containing high-density core populations, a large extent of high-quality habitat, a large seed bank, and therefore, areas important for the recovery of the species."  FW1735-36, FW1760, FW1766; ISD31621-22.[12]

The Court is also mindful that although courts may compel an agency to "act within a reasonable time," *Houseton v. Nimmo*, 670 F.2d 1375, 1377 (9th Cir. 1982), courts are "ill-suited to review the order in which an agency conducts its business" and "hesitant to upset an agency's priorities by ordering it to expedite one specific action." *Sierra Club v. Thomas*, 828 F.2d 783, 797 (D.C. Cir. 1987).  The Court finds it significant there are 29 species identified for recovery plan development in the FY2013-2017 WAG, and the Court is reluctant to "reorder[] agency priorities. The agency is in a unique—and authoritative—position to view its projects as a whole, estimate the prospects for each, and allocate its resources in the optimal way. Such budget flexibility as Congress has allowed the agency is not for

---

[12]  "FW____" refers to FWS's administrative record for the 2012 BiOp, and "ISD____" refers to BLM's administrative record for the 2013 ROD, RAMP and EIS.

United States District Court
For the Northern District of California

[courts] to hijack." *In re Barr Labs.*, 930 F.2d 72, 75 (D.C. Cir. 1991).  If the Court ordered the FWS to complete the PMV recovery plan within two years, as plaintiffs request, the PMV would be prioritized over these other species, thus impeding FWS's duty to prioritize recovery planning for the species most likely to benefit.  *See* 16 U.S.C. § 1533(f)(1).    The Court finds that the July 31, 2019 deadline is reasonable because it will not disrupt the FWS's other recovery work, but will also set a date certain by which the FWS will be required to take action.

Accordingly, the Court GRANTS IN PART plaintiffs' motion for summary judgment on this issue and ORDERS FWS to complete a PMV recovery plan by July 31, 2019, unless FWS "finds that such a plan will not promote the conservation of the [PMV]." 16 U.S.C. § 1533(f)(1).

### III.    National Environmental Policy Act - Wilderness Values

The National Environmental Policy Act ("NEPA") requires federal agencies to analyze the environmental impacts of a proposed action before proceeding with that action.  *See* 42 U.S.C. § 4332(2)(C).    Under NEPA and the regulations promulgated thereunder by the Council on Environmental Quality ("CEQ"), federal agencies must prepare and circulate to the public a comprehensive environmental impact statement ("EIS") so that the environmental impacts can be considered and disclosed to the public during the decision-making process.  *See* 40 C.F.R. §§ 1501.2, 1502.5.  In the EIS, the agency must identify direct, indirect, and cumulative impacts of the proposed action, consider alternative actions (including the alternative of taking no action) and their impacts, and identify all irreversible and irretrievable commitments of resources associated with the action.  *See* 42 U.S.C. § 4332(2); 40 C.F.R. § 1502.14(d).  Plaintiffs contend that BLM violated NEPA by failing adequately to address in the Final EIS ("FEIS") the impacts of the 2013 RAMP on the wilderness characteristics of a portion of the South Algodones Dunes known as "WCU 1," which would largely be opened up to OHV use under the 2013 RAMP.

In 1964 Congress passed the Wilderness Act with the purpose "to assure that an increasing population, accompanied by expanding settlement and growing mechanization, does not occupy and modify all areas within the United States and its possessions, leaving no lands designated for preservation and protection in their natural condition." 16 U.S.C. § 1131(a). The Wilderness Act defines

United States District Court
For the Northern District of California

"wilderness," "in contrast with those areas where man and his own works dominate the landscape," as:

> an area where the earth and its community of life are untrammeled by man, where man himself is a visitor who does not remain. An area of wilderness is further defined to mean in this chapter an area of undeveloped Federal land retaining its primeval character and influence, without permanent improvements or human habitation, which is protected and managed so as to preserve its natural conditions and which (1) generally appears to have been affected primarily by the forces of nature, with the imprint of man's work substantially unnoticeable; (2) has outstanding opportunities for solitude or a primitive and unconfined type of recreation; (3) has at least five thousand acres of land or is of sufficient size as to make practicable its preservation and use in an unimpaired condition; and (4) may also contain ecological, geological, or other features of scientific, educational, scenic, or historical value.

16 U.S.C. § 1131(c).

The Wilderness Act did not directly address the BLM's management of its lands. The Federal Land Planning Management Act "interacts with the Wilderness Act to provide the BLM with broad authority to manage areas with wilderness characteristics contained in the federally owned land parcels the Bureau oversees, including by recommending these areas for permanent congressional protection." *Oregon Natural Desert Ass'n v. Bureau of Land Management*, 625 F.3d 1092, 1097 (9th Cir. 2010) ("*ONDA*"). "[T]he FLPMA makes clear that wilderness characteristics are among the values which the BLM can address in its land use plans, and hence, needs to address in the NEPA analysis for a land use plan governing areas which may have wilderness values." *Id.* at 1112.

Pursuant to the FLPMA, BLM established two Wilderness Study Areas ("WSAs") for the purpose of identifying and recommending areas for preservation as wilderness: (1) the North Algodones Dunes; and (2) the South Algodones Dunes. Congress designated the North Algodones Dunes, but not the South Algodones Dunes, as a wilderness area through the California Desert Protection Act of 1994. ISD3178.[13] Wilderness Characteristic Unit 1 ("WCU 1") is a subset of the South Algodones Dunes. WCU 1 is composed of 42,083 acres of BLM administered lands and has been closed to OHVs since November 2000 as part of the interim closures. In the FEIS, BLM stated that WCU 1 "appears essentially untrammeled by humans" and "offers numerous opportunities for primitive forms of

---

[13] According to defendants, the South Algodones Dunes were considered not suitable for wilderness designation, in part, because "motorized vehicle activity has severely reduced much of the natural vegetative cover" in the north, and human presence is "substantially noticeable" in the south. ISD39868; *see also* ISD38209.

United States District Court
For the Northern District of California

recreation in the form of hiking, backpacking, and nature studies." ISD3179.  BLM identified this area as having wilderness characteristics, and formally designated it as "WCU 1," or "Wilderness Characteristics Unit 1" for planning purposes.  *Id.*  Under the 2013 RAMP, the portion of WCU 1 that overlaps with PMV critical habitat, 5663 acres, would remain closed to OHVs, while the remaining 36,420 acres would be opened to OHVs.   Plaintiffs contend that the FEIS provides no meaningful analysis of the impacts on the portion of WCU 1 that would be opened to OHVs.

"We review an Environmental Impact Statement under the 'rule of reason' to determine whether it contains 'a reasonably thorough discussion of the significant aspects of the probable environmental consequences.'" *City of Carmel-By-The-Sea v. U.S. Dep't of Transp.*, 123 F.3d 1142, 1150 (9th Cir. 1997) (quoting *Idaho Conservation League v. Mumma*, 956 F.2d 1508, 1519 (9th Cir. 1992)).  "We make 'a pragmatic judgment whether the [Environmental Impact Statement's] form, content and preparation foster both informed decision-making and informed public participation.'" *City of Carmel-By-The-Sea*, 123 F.3d at 1150-51 (quoting *California v. Block*, 690 F.2d 753, 761 (9th Cir. 1982)).  "Once satisfied that a proposing agency has taken a 'hard look' at a decision's environmental consequences, [our] review is at an end."  *Id.* at 1151.

Plaintiffs assert that the only analysis in the FEIS about wilderness characteristics consists of a "few generic statements on the relative impacts of the different alternatives."  Docket No. 231 at 15:8-9.  Plaintiffs identify the following two excerpts as "the entire extent" of BLM's analysis of projected effects on WCU 1:

> Differences in impacts to special designations would potentially vary by alternative. Alternatives providing more acreage for OHV recreation, camping, construction activities, as well as renewable energy and geothermal leasing activities would result in greater adverse impacts (Table 4-14).  Alternatives providing more acreage for resource protection, such as areas closed to OHV recreation, closed or with [no surface occupancy] for surface disturbing activities related to geothermal, solar, and wind energy, would result in greater beneficial effects on special designation areas.

ISD3363.

> Under Alternatives 2 and 3, 42,083 acres would be closed to OHV recreation in WCU 1.  These alternatives would have the highest acres closed to OHV recreation, and the most beneficial impacts to the wilderness characteristics and values of WCU 1.....Under Alternative 8, 25,473 acres would be open, 5,663 acres would be closed, and 10,947 would be limited to OHV recreation in the WCU 1 designation. This alternative would have the lowest acres of closed OHV recreation and the highest acres designated as limited OHV recreation use.

ISD3367.  Plaintiffs argue that BLM's "purported 'hard look' boils down to the completely self-evident and uninformative statement that the alternative with the fewest acres of WCU 1 closed to OHVs will 'result in greater adverse impacts.'" Docket No. 231 at 15:23-25.

Defendants respond that the FEIS contains a "reasonably thorough discussion" of the wilderness characteristics of WCU 1 and the potential impacts to that area, which is all that NEPA requires.  *See City of Carmel-By-The-Sea*, 123 F.3d at 1150.  The Court agrees.  In the "Affected Environment" section, the FEIS includes a discussion of "Lands with Wilderness Characteristics."  ISD3177-3179.  The FEIS states that BLM evaluated the wilderness characteristics of "current lands and lands acquired outside of, or adjacent to designated wilderness, since passage of the CDPA in 1994."  ISD3178.  This included WCU 1.  The FEIS describes WCU 1 as follows:

> The WCU 1 contains 42,083 acres of public lands. The area's west boundary follows the edge of the dune system, whereas the east boundary follows Wash Road adjacent to the UPRR tracks. The north and south boundaries indicate the limit of substantially noticeable impacts resulting from OHV use. The WCU 1 is completely surrounded by public lands and has a 640-acre section of private lands in the middle. Although WCU 1 may be traversed by a limited number of OHVs in the winter, and small portions of the landscape include trails which are 20- to 50-foot-wide strips devoid of vegetation, the area appears essentially untrammeled by humans . . . . The undulating topography shields recreationists from each other and provides ample opportunities for solitude. OHV and military aircraft noise periodically disrupt these perceptions of solitude. The WCU 1 offers numerous opportunities for primitive forms of recreation in the form of hiking, backpacking and nature studies.

ISD3179.

The FEIS also explains that impacts on wilderness characteristics "are those actions that reduce or enhance the wilderness characteristics of naturalness and opportunities for solitude or primitive forms of recreation." ISD3361. The FEIS states that OHV recreation has the potential to disturb the "naturalness and solitude" of wilderness:  "These characteristics and values could be impacted by the use of motor vehicles and installation of structures causing surface disturbance and evidence of the human-caused modifications of the area." *Id.*  The FEIS identifies measures that would promote and preserve wilderness characteristics, such as dust control measures, and states that "[r]estoration of previously disturbed areas could improve wildlife habitat and reduce instances of illegal incursion

1   within the ACECs[14] and wilderness." *Id.* The FEIS also states that "any closures resulting from special

2   status species management could enhance the protection for the wilderness and ACEC values, and visual

3   resource management "could increase scenic quality values of the wilderness and ACECs." *Id.*

4       In addition, the FEIS discusses how the different alternatives will affect ACECs and special

5   designation areas such as WCU 1:

6           Differences in impacts to special designations would potentially vary by alternative.
        Alternatives providing more acreage for OHV recreation, camping, construction
7           activities, as well as renewable energy and geothermal leasing activities would result
        in greater adverse impacts (Table 4-14). Alternatives providing more acreage for
8           resource protection, such as areas closed to OHV recreation, closed or with NSO for
        surface-disturbing activities related to geothermal, solar, and wind energy, would
9           result in greater beneficial effects on special designation areas.

10  *Id.* at ISD3363. With regard to WCU 1, the FEIS includes the following information: (1) under

11  Alternatives 4, 5, 6, and 7, 42,083 acres of WCU 1 would be open to geothermal leasing, but there

12  would be no geothermal leasing in WCU 1 under Alternatives 2, 3, and 8 (the proposed RAMP); and

13  (2) under Alternative 7, 42,083 acres of WCU 1 would be available for solar and wind energy

14  development, but would be closed to such development under Alternatives 1 through 6 and Alternative

15  8. *Id.* at ISD3367. Plaintiffs assert that it is self-evident and therefore meaningless to conclude that

16  reopening the central dunes to OHV use will diminish wilderness characteristics in WCU 1. However,

17  it is not clear what further analysis plaintiffs contend should have been performed as the preferred

18  alternative, Alternative 8, does not propose to install any structures or visitor amenities in the central

19  dunes of WCU 1, and the only non-wilderness components that the RAMP introduces into WCU 1 are

20  vehicles and their occupants.

21      The cases cited by plaintiffs are distinguishable. In *ONDA*, 625 F.3d 1092 (9th Cir. 2010), the

22  BLM prepared an EIS that only evaluated wilderness characteristics in areas designated as wilderness

23  study areas, and the BLM contended that it had no duty to inventory or analyze wilderness

24  characteristics in non-wilderness areas. *Id.* at 1102, 1115. The Ninth Circuit disagreed, and invalidated

25  the EIS for failing to evaluate wilderness characteristics in non-WSA areas.  *Id.* at 1121.

26  *Klamath-Siskiyou Wildlands Center v. Bureau of Land Management*, 387 F.3d 989 (9th Cir. 2004), did

27

28          [14]  "ACEC" stands for Areas of Critical Environmental Concern.

United States District Court
For the Northern District of California

1  not involve an assessment of wilderness characteristics at all.  In *Klamath-Siskiyou*, the Ninth Circuit

2  invalidated environmental assessments where, *inter alia*, the discussion of cumulative impacts consisted

3  of a table with a list of environmental concerns, such as air quality, and "even though all of the boxes

4  are checked 'No' to indicate that the critical elements in question will not be affected, the report actually

5  states that fully half of the elements either would be or could be in fact 'impacted,' without giving any

6  details or explanation." *Id.* at 995.  Here, in contrast, the BLM assessed the wilderness characteristics

7  of WCU 1 and described the RAMP's effects on those characteristics.  *See* ISD3361-3367.

8          Accordingly, the Court GRANTS summary judgment in favor of defendants on this issue.

9

10  **IV.    Air Quality Analysis**

11          The federal Clean Air Act ("CAA") establishes a comprehensive program for controlling and

12  improving the nation's air quality through shared federal and state responsibility.  The CAA authorizes

13  the Environmental Protection Agency ("EPA") to establish national ambient air quality standards

14  ("NAAQSs") for pollutants deemed by EPA to be "criteria" pollutants, including volatile organic

15  compounds ("VOCs") and nitrogen oxides ("NOx") – both of which are considered precursors to

16  ozone[15] – and particulate matter with a diameter greater than 10 microns ("PM-10").  42 U.S.C. §§ 7407-

17  7410.  EPA designates areas which fail to attain an NAAQS standard as "nonattainment areas."  *Id.*

18  §§ 7407(d)(1).  Nonattainment areas are divided into five categories, based upon the severity of the

19  pollution: "Marginal," "Moderate," "Serious," "Severe," and "Extreme."  *Id.* § 7511.

20          The Imperial County Air Pollution Control District ("ICAPCD"), which includes the ISDRA,

21  is designated as a serious non-attainment area for PM-10 and a moderate non-attainment area for ozone.

22  ISD3283.  The ICAPCD has promulgated regulations for the control of PM-10, which have been

23  approved by EPA.  78 Fed. Reg. 23,677 (Apr. 22, 2013).  Pursuant to an ICAPCD rule governing

24  "fugitive dust," BLM was required to submit a dust control plan for OHV use in the Dunes.  ISD63050.

25  The ICAPCD approved the dust control plan in July 2013.  ISD63027.

26          Section 110(a) of the Clean Air Act, 42 U.S.C. § 7410(a), sets forth the process by which the

27  _____

28      [15] The parties sometimes refer generally to "ozone," and other times specifically to VOCs and NOx.

United States District Court
For the Northern District of California

states may develop their own regulatory programs, called "State Implementation Plans" ("SIPs"), that satisfy the minimum requirements of the Clean Air Act. *See generally* 42 U.S.C. § 7410(a). A SIP must specify emission limitations and other measures necessary to maintain the NAAQS for each pollutant. 42 U.S.C. § 7410(a)(2)(A)-(M). Section 176(c)(1) of the CAA provides that no federal agency shall "engage in, support in any way or provide financial assistance for, license or permit, or approve, any activity which does not conform to [a SIP]." 42 U.S.C. § 7506(c)(1). This is referred to as the "conformity" requirement. Pursuant to EPA regulations regarding conformity, BLM was required to assess the RAMP's "conformity" with California's State Implementation Plan (SIP) applicable to Imperial County. 40 C.F.R. Part 93, Subpart B; *see also* ISD3282-3283. BLM is not required to conduct a conformity review, however, if the data establish that the RAMP will generate PM-10 and ozone in quantities below the Clean Air Act's "de minimis" thresholds. *See* 40 C.F.R. § 93.153(b). For Imperial County, the de minimis thresholds for PM-10 and ozone are 70 tons per year and 100 tons per year, respectively, when measured as an increase over baseline conditions. BLM 3283 [Table 4-4]. In the FEIS, BLM determined that adopting the preferred alternative would not result in a greater than de minimis increase in emissions of PM10 and ozone compared with existing conditions. ISD3283-85. As a result, the BLM was not required to make a "conformity determination" under the CAA in order to adopt the 2013 RAMP.

Plaintiffs challenge BLM's air quality analysis as flawed and in violation of the requirements of the Clean Air Act, the Federal Land Policy Management Act and NEPA. Plaintiffs note that in the Draft EIS ("DEIS"), BLM estimated that the increase in VOCs and PM-10 emissions from adopting the preferred alternative in the 2013 RAMP would greatly exceed the de minimis thresholds of the conformity regulations, and BLM acknowledged that if it adopted the proposed RAMP it would need to carry out a full conformity determination for ozone and PM-10. ISD30858-30859. Plaintiffs contend that, "[g]iven the very high emissions increases estimated in the DEIS, particularly of PM-10, it is highly unlikely, if not outright impossible, that BLM could have ultimately made a finding that its proposed RAMP conformed to ICAPCD's SIPs and the relevant regulations." Docket No. 231 at 19:4-6.

Between the DEIS and FEIS, BLM recalculated the emissions by changing several assumptions used in the DEIS, which significantly reduced both the total estimated emissions of PM-10 and VOCs,

United States District Court

For the Northern District of California

as well as in the difference in emissions from current conditions that would result from adoption of the proposed alternatives.  This analysis is described in Appendix Q to the FEIS and supporting emissions data spreadsheet.  ISD3790-98, ISD63133-35.

The main factor contributing to the change in projected emissions between the DEIS and FEIS (an 80% reduction) is the use of actual soil data in the FEIS rather than the standard assumptions that were used in the DEIS.  ISD17452. The FEIS states, "[i]n reviewing the results and techniques of the previous analysis [the DEIS], BLM determined the standard assumptions that were used greatly overestimated emissions.  Since that time, BLM has been able to collect site samples and develop a more refined analysis."  ISD3795.  BLM staff collected soil samples from the different recreation areas at the Dunes and determined the silt content, which is the component of the soil that contributes to PM-10 emissions.  *Id.* at ISD3796-98.  Using the actual soil data in the FEIS, BLM found that adoption of the preferred alternative would result in a slight decrease in PM10 emissions from the baseline (Alternative 2), *id.* at ISD3284, as a result of shifting OHV activities to areas of the Dunes with lower silt content, ISD3798, and implementing mitigation measures included in the preferred alternative, ISD3289.

Plaintiffs contend that the BLM used improper soil sampling methods because BLM did not comply with ICAPCD Rule 800.  Plaintiffs argue that "the required sampling methods are in the county's CAA PM-10 implementation plan in a rule denominated as 'General Requirements for the Control of Fine Particulate Matter (PM-10),' and do not in any way appear to be to be limited to dust control plans."  Docket No. 236 at 20:1-3.  Plaintiffs argue that Rule 800 G.1.e, "Determination of Silt Content for Unpaved Roads and Unpaved Vehicle/Equipment Traffic Areas," requires that silt content for unpaved roads and unpaved traffic areas be determined using a specific defined method or other equivalent method approved by EPA, and the state and local agency.  Plaintiffs assert that "BLM did not use the Rule 800 method, has not claimed it has used an approved equivalent method, and remains unable to detail what method it actually employed. BLM's reliance upon the soil analysis is arbitrary."  *Id.* at 20:7-9.

Defendants respond that the test method specified by ICAPCD Rule 800.G.1.e (the method identified in ICAPCD Rule 800 App. B, Section C), is used to determine whether an area has a "stabilized surface."  *See* ICAPCD Rule 800.G.1.e ("Observations to determine compliance with the

1    conditions specified for a stabilized surface, in any inactive disturbed surface area, whether at a work

2    site that is under construction, at a work site that is temporarily or permanently inactive, or on an open

3    area and vacant lot, shall be conducted in accordance with the test methods described in Appendix B

4    of this rule.").  Defendants contend that this regulation is inapplicable because the purpose of BLM's

5    analysis was not to determine whether an area had a stabilized surface, but rather to determine the silt

6    content.  The Court agrees with defendants that on its face, this regulation does not apply to the soil

7    sampling at issue, and thus plaintiffs have not shown that the soil sampling that BLM conducted is

8    "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C.

9    § 706(2)(A).[16]

10        Another major factor contributing to the change in projected emissions between the DEIS and

11    FEIS is BLM's determination that increasing the number of acres available to OHVs would not increase

12    the number of visitors to the Dunes.  In the DEIS, BLM assumed that the number of visitors was

13    proportional to the available acreage, and thus that opening up more acreage to OHVs would cause a

14    corresponding increase in vehicle-related emissions.  ISD30936-30938, ISD30856-30859. Plaintiffs

15    contend that the change in assumptions about number of visitors is unsupported and inconsistent with

16    other parts of the FEIS, such as the sections describing social and economic impacts, which assumed

17    that opening up more acres to OHVs would increase the number of OHV visitors.

18        The Court concludes that the assumption about number of visitors in the FEIS is supported by

19    the record.  As an initial matter, the Court notes that plaintiffs have not identified any data in the record

20    showing that OHV use is proportional to available area, or that opening up the closed areas will lead to

---

24    [16] Plaintiffs also assert that BLM "failed to consider an important aspect of the problem" because "BLM did not analyze the increase in dust from destroying delicate soil crusts that have formed

25    in the currently closed areas, despite EPA and ICAPCD calling for such analysis."  Docket No. 236 at 20:18-21.  As support, plaintiffs cite a comment from ICAPCD to the DEIS and a comment by EPA to

26    the FEIS. *See* Docket No. 231 at 22:2-9 (citing ISD22874 and ISD2439).  However, neither comment specifically calls for this type of analysis.  In any event, the Court does not find that the agency acted

27    in an arbitrary or capricious manner given the BLM's conclusion that OHV ridership would not increase, as well as the soil sampling which addresses the fact that opening some closed areas may

28    change where people choose to ride OHVs.

United States District Court
For the Northern District of California

an increase in OHV visitors.[17]  Indeed, earlier in this litigation plaintiffs successfully challenged 2004 final rule designating critical habitat for the PMV by arguing that the economic analysis underlying that rule incorrectly assumed that the interim OHV closures had resulted in a 15% decline per year in visitation.  *Ctr. for Biological Diversity v. BLM*, 422 F. Supp. 2d at 1148.  The Court agreed with plaintiffs and found that there was "no data in the record linking the interim closures to any reduced OHV visitation levels at the Dunes."  *Id*. at 149.  The Court noted, *inter alia*, that "the BLM itself did not observe a drop in visitation related to the closures, and indicated that the temporary closures likely had a minimal impact on visitation. . . . [and that] that there is no accurate pre-2002 visitation data due to the BLM's methodology for counting visitation."  *Id*. at 148.  Plaintiffs argue that this portion of the 2006 summary judgment decision was focused on an entirely different issue and an entirely different record.  While plaintiffs are correct that precise issue before the Court in 2006 was different, it is nevertheless true that the facts before the Court in 2006 and today are the same: there is no data in the record showing that the interim closures led to a decrease in OHV visitation, nor is there any data conversely showing that opening up acres to OHVs will increase OHV visitation.

Further, as defendants note, between the DEIS and FEIS, BLM analyzed visitor data, and that data showed that while the number of visitors fluctuated from year to year, those fluctuations were not associated with area closures.  ISD36246-36249.[18]  Plaintiffs assert that BLM is trying to "have it both

---

[17]  The FEIS does find that increases in OHV use for the preferred alternative would be "similar to recent trends (approximately 3 percent per year, depending on economic conditions)."  ISD3400.  As defendants note, an increase due to a continuation of current visitation trends – as opposed to an increase due to opening the closed areas – is part of the baseline condition and is not as a result of the action under review, and thus is not relevant for determining emissions associated with that action.

[18]  Plaintiffs cite a contractor's 2008 economic analysis prepared for FWS regarding the revised critical habitat designation for the PMV, which states, *inter alia*, that there is a "generally accepted economic theory and studies from the economics literature which support the assumption that closure of a portion of a recreation area is likely to result in fewer visits to that area."  ISD36211.  However, as defendants note, that same report repeatedly states that there is considerable uncertainty as to whether the proportional visitation assumption was applicable to the Dunes.  *See e.g., id*. at n. 3 ("Due to the uncertainty inherent in estimating impacts of the temporary closures on visitation at the ISDRA, this economic analysis estimates a range of pre-designation for[] OHV visitation.  Under the lower bound scenario, this analysis assumes that past closures did not affect visitation.  In particular, as the BLM has previously indicated that the past closures had a minimal impact on visitation (personal communication with Knauf and Hamada, BLM October 17, 2003), the lower bound scenario accounts for this potential outcome."); *see id*. at 36220 ("It is not possible, using existing data, to model the effect of closures of portions of the ISDRA on the behavior of OHV recreators at the ISDRA.").

ways" by assuming no increased OHV visitation for the air quality analyses and assuming some increase in OHV visitation in the social and economic impacts sections.  However, the FEIS concluded that "[n]o significant economic impacts were determined for any of the proposed alternatives."  ISD3409. On this record, the Court cannot conclude that BLM's visitor assumptions underlying the air emissions analysis in the FEIS are arbitrary or capricious.  *Cf. San Luis & Delta-Mendota Water Authority v. Jewell*, ___ F.3d ___, 2014 WL 975130, at *15 (9th Cir. Mar. 13, 2014) (upholding agency's action where "FWS acknowledged the uncertainty inherent to modeling the relation between OMR flows and smelt and chose a conservative model, a choice that is within the FWS's discretion to make").[19]

Finally, plaintiffs challenge BLM's assumptions for number of OHVs, visitor days, average speed, and time spent riding OHVs.  However, as defendants note, these assumptions apply equally to the baseline condition and the preferred alternative, and thus have no effect on BLM's conclusion that the RAMP will not cause more than a de minimis increase in emissions given BLM's determination that the chosen alternative will not cause an increase in the number of visitors.

Accordingly, the Court concludes that BLM complied with the CAA, FLPMA and NEPA, and GRANTS summary judgment in favor of defendants on these claims.

## CONCLUSION

For the foregoing reasons and for good cause shown, the Court hereby GRANTS in part and DENIES in part plaintiffs' motion for summary judgment (Docket No. 231) and GRANTS in part and DENIES in part defendants' motions for summary judgment (Docket Nos. 232 & 234).

**IT IS SO ORDERED.**

Dated: April 3, 2014

_____
SUSAN ILLSTON
United States District Judge

---

[19] Plaintiffs also contend that the air quality analysis fails to account for emissions from "mother vehicles" and campfires.  However, the number of mother vehicles and campfires is directly related to the number of visitors, and the FEIS determined that the 2013 RAMP will not increase visitorship.